IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| **RICH FINANCIAL, LLC,** | |
| **Plaintiffs,** | |
| | **MEMORANDUM DECISION** |
| **vs.** | **AND ORDER** |
| **UNITED STATES OF AMERICA,** | Case No. 2:07CV403DAK |
| **Defendant.** | |

This matter is before the court on cross motions for summary judgment on the issue of the

priority of the parties' rights in funds levied by the IRS.  The court held a hearing on these

motions on November 25, 2008.  At the hearing, Plaintiff was represented by Craig Howe, and

Defendant was represented by Rick Watson.  The court took the motions under advisement.  The

court has carefully considered all pleadings, memoranda, and other materials submitted by the

parties, the arguments made by counsel at the hearing, and the law and facts relevant to the

motions.  Now being fully advised, the court enters the following Memorandum Decision and

Order.

**BACKGROUND**

Plaintiff Rich Financial is a third party creditor who loaned money to BCBU, or Rocky

Mountain Home Care.  Rich Financial is an entity controlled by Lamar and Jay Bangerter.

Rocky Mountain is controlled by their cousin Dee Bangerter.  On March 5, 1995, Rich Financial

and Rocky Mountain signed a promissory note for $2.1 million in favor of Rich Financial.

Pursuant to the promissory note, Rich Financial established a line of credit to Rocky Mountain

("Rocky Mountain account").  The promissory note was secured by a security agreement, which

granted Rich Financial a lien in and to all of BCBU's accounts receivable, equipment, leasehold

improvements, and the proceeds of each.

Paragraph 4 of the promissory note states that it is secured by "all Accounts Receivable of

[Rocky Mountain] in addition to all leasehold improvements on [its] premises."  The security

agreement further defines collateral as "All of [Rocky Mountain]'s accounts receivable

evidencing any right to payment for goods sold or leased or for services rendered."  The security

agreement also defines Rocky Mountain's payment obligations as "the sum evidenced by the

above-mentioned note or any renewals or extensions thereof executed pursuant to this security

agreement in accordance with the terms of such note and any other obligations that now exist or

may hereafter accrue from [Rocky Mountain] to [Rich Financial]."

The line of credit agreement was periodically renewed between the two parties on

essentially the same terms.  None of these renewals changed the collateral or terms of the line of

credit or the security agreement.  Beginning on March 3, 1995, and continuing until at least April

9, 2007, Rich Financial regularly made advances to Rocky Mountain under this line of credit.

The purpose of the line of credit and the advances was to fund the operations of Rocky

Mountain.  Rich Financial recorded the line of credit and security agreement with the Department

of Commerce on July 9, 2002.

At various dates prior to and including December 31, 2002, Rich Financial also began

including obligations other than those representing advances directly to Rocky Mountain in the

Rocky Mountain account.  On October 9, 1997, Rich Financial added an obligation of $118,000

to the Rocky Mountain account representing a distribution or loan to the mother of Dee and Lee

Bangerter, the individuals who controlled Rocky Mountain.  Rich Financial provides no

explanation for why Rocky Mountain would be responsible to Rich Financial for monies

distributed to an individual rather than the company.

In addition, between May 1997 and August 1999, Rich Financial also established lines of

credit with several other entities controlled by Dee and Lee Bangerter.  These other entities

included United Alternative Home Care, Nurse Network of Utah, Pro Med, Inc., United Home

Health Care of Southern California, United Home Care dba CSM Home Health Care, and

Premier Home Care Services.  However, no documents related to these lines of credit were ever

recorded with the Utah Department of Commerce, with the exception of documents relating to

the line of credit with CSM Home Health Care.

Rich Financial made advances to these entities under the separate lines of credit.  The

advances were made for the separate entity, not Rocky Mountain.  However, all of these

additional lines of credit ultimately went into default.  On February 15, 2000, the defaulted lines

of credit between Rich Financial and United Alternative Home Care, Nurse Network of Utah,

Pro Med, Inc., United Home Health Care of Southern California, and Premier Home Care

Services were consolidated into the line of credit between Rich Financial and Rocky Mountain.

On December 31, 2002, the line of credit between Rich and United Home Care dba CSM Home

Health Care was consolidated into the line of credit between Rich Financial and Rocky

Mountain.  These consolidations were done to make payment of the separate obligations more

convenient for Dee and Lee Bangerter.

On March 20, 2003, a representative of the Secretary of the Treasury recorded a Notice of

Federal Tax Lien ("NFTL") concerning the tax liabilities of Rocky Mountain with the County

Recorder in Davis County, Utah, the proper place to record such an instrument.  Other NFTLs

concerning the liabilities of Rocky Mountain were recorded in Salt Lake and Davis Counties at

this time and subsequently.  The total amount ultimately levied by the IRS pursuant to the

NFTLS was $1,306,227.00.

As of May 5, 2003, which is legally significant because it is 45 days after the NFTL was

filed, the principal balance on Rocky Mountain's line of credit for sums directly advanced to

Rocky Mountain was $423,959.40.  The consolidated amount due and owing on May 5, 2003,

however, was $2,875,181.42.

The last advance to Rocky Mountain under the line of credit prior to May 5, 2003, was on

July 22, 2002.  But, beginning again on December 23, 2003, and continuing until at least April 9,

2007, Rich Financial continued to make other regular advances to Rocky Mountain.  Also after

May 5, 2003, Rocky Mountain made payments to Rich Financial totaling $1,510,000.  Neither

Rich Financial, Rocky Mountain, nor the underlying documents made any designation as to how

these payments were to be applied.

On December 13, 2002, Rocky Mountain and other entities controlled by Dee and Lee

Bangerter, none of which include the entities who received a line of credit from Rich Financial

and whose obligations were consolidated into Rocky Mountain's account, filed a lawsuit against

the State of Utah.  The lawsuit alleged breach of contract and breach of the implied covenant of

good faith and fair dealing relating to the State's Medicaid reimbursements to Rocky Mountain.

The entities claimed that the State had established and paid rates to them that were below the

reimbursement rates required by certain Medicaid policies, standards, and methods.  Rocky

Mountain and the other entities sought damages of over $16 million and injunctive relief.

On March 14, 2007, the parties to the action filed a stipulated motion for dismissal with prejudice.  That motion indicated that the parties had "resolved the matter, without either party denying or admitting liability to the other, based on a payment from [the State] to Plaintiffs in the amount of $7 million dollars and in exchange for mutual releases concerning the subject matter of the claims."  On March 20, 2007, the court dismissed the suit based on the stipulation.  On April 5, 2007, the IRS levied on the settlement funds Rocky Mountain was to receive from the State.

On June 19, 2007, Rich Financial filed this action against the United States asserting two causes of action: (1) wrongful levy pursuant to 26 U.S.C. § 7426; and (2) declaratory judgment pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the Utah Declaratory Judgments Act, Utah Code Ann. § 78-33-1.  On a previous motion to dismiss, this court dismissed Rich's second cause of action.

After this litigation began, on November 10, 2008, Rich re-recorded with the Utah Department of Commerce a new UCC-1 filing statement concerning the line of credit between Rich Financial and Rocky Mountain.  The collateral obligation was now defined to include proceeds from the litigation against the Utah Department of Health, although the terms of the line of credit did not change.

## DISCUSSION

The parties have filed cross motions for summary judgment asserting a priority of interest in the settlement funds levied by the IRS.  Rich Financial claims that its security interest in the funds is superior to the IRS's NFTL and that the IRS wrongfully levied Rocky Mountain's

settlement funds.  Conversely, the government argues that the NFTL is superior to Rich

Financial's security interest and that Rich Financial does not have a security interest in the

settlement funds that Rocky Mountain obtained from the State of Utah.

## A.  Priority of Interests

Lien priority questions involving a federal tax lien are decided by federal law under the

principle of "the first in time is the first in right*." United States v. McDermott*, 507 U.S. 447, 449

(1993).  Under 26 U.S.C. § 6321, once the IRS makes an assessment that tax is due from a

taxpayer, a lien is created in favor of the Untied States without any particular filing requirement.

*Id.* at 449.  The "general rule is that the tax collector prevails even if he has not recorded at all."

*Id*. at 454.

Section 6323 of the Internal Revenue Code, however, establishes that certain interests can

be superior to a tax lien.  Subsection (d) of Section 6323 provides for priority against a filed

federal tax lien for security interests in property arising out of advances made within 45 days of

the filing of the IRS's tax lien or until knowledge is obtained of the filing of the lien, if earlier.

26 U.S.C. § 6323; *see also Slodov v. United States*, 436 U.S. 238, 258 n.22 (1978) ("when a

security agreement exists and filing has occurred prior to the filing of a tax lien to secure

advances made after the tax filing, perfection is, at the least, achieved when the secured party

makes the advance.  When that occurs after the tax lien has been filed, section 6323(d) protects

the secured party from the federal tax lien if the advance is made not later than 45 days after the

filing of the tax lien or upon receipt of actual notice of the tax lien filing, whichever is sooner.").

It is undisputed in this case that the United States first filed an NFTL in Davis County,

Rocky Mountain's place of business, on March 20, 2003.  Under Section 6323(d), Rich had 45

days from that date, or until May 5, 2003, to make advances to Rocky Mountain under the line of

credit in order to secure them against the United States's NFTL.  All later extensions of credit,

and interest and costs accrued thereon, are similarly secured, but remain in third-priority position

behind the United States' tax lien. Therefore, the parties' dispute focuses on the amount Rocky

Mountain was obligated to pay Rich Financial as of May 5, 2003.

The government does not dispute that Rich Financial properly perfected its security

interest on July 9, 2002.  Also, the government does not dispute both that the Medicaid payments

at issue constitute "accounts receivable" and that the accounts receivable arose when Rocky

Mountain performed the Medicaid services, which was before the recording of the first NFTL.

Rather, in its motion, the government contends that it has priority to the disputed funds because

Rocky Mountain discharged any amount that would have had priority, Rich Financial's security

interest in accounts receivable does not include the settlement funds with the State, and, even if

Rich had an interest in the settlement funds, it was inchoate at the time the government filed the

first tax lien.

Between May 5, 2003, and December 8, 2006, Rocky Mountain made $1,510,000 in

payments to Rich Financial on its line of credit.  Rocky Mountain also made numerous draws on

the line of credit after May 5, 2003.  However, where the security is the same, payments are

applied to the oldest balance first, unless otherwise designated.  *United States v. Kirkpatrick*, 22

U.S. 720, 737-38 (1824); *American Investment Financial v. United States*, 364 F. Supp. 2d 1321

(D. Utah 2005) (security interest only protected for 45 days after the filing of a notice of federal

tax lien).

In *Lee v. Yano*, 997 P.2d 68 (Hawaii Ct. App. 2000), the court noted that, as a "general

rule, a third person who is secondarily liable on a debt, such as a guarantor, surety, or endorser, cannot control the application which either the debtor or the creditor makes of a payment, and neither the debtor nor the creditor need apply the payment in the manner most beneficial to such person." *Id.* at 76.

Rich Financial relies on this language from *Lee* to argue that the court should not apply the presumptive rule because it is most beneficial to the government. Moreover, Rich Financial claims that the presumptive rule relied on by the government applies, if at all, only when the parties themselves have not agreed on an allocation of the payments or have not otherwise allocated the payments. *See Standard Surety & Cas. Co. v. United States*, 154 F.2d 335, 337 (10th Cir. 1946) (stating that if both parties to a contract fail to make the allocation, "then the law will make the allocation"). When the law makes the allocation according to its own notions of justice, the *Standard Surety* case explained that the correct rules is that "[w]hen the security is the same, the state and federal rule is to apply the payment first to the oldest obligation. When the security is not the same, the rule is to apply the payment first to the obligation least secured, or whose security is most precarious." *Id.*

Rich Financial claims that in the promissory notes executed by Rich and Rocky Mountain, the parties agreed on how payments would be allocated to the outstanding obligations. The allocation of payments described in the line of credit agreement, however, is: 1) costs of enforcement; 2) interest; and 3) the unpaid principal under the Note. In this case, there are no costs of enforcement and there is no dispute over interest payments. The relevant issue is how to apply payments after the perfection of the federal tax liens to the unpaid principal under the Note. The issue is not enforcement costs or interest. Here, the underlying instrument does not specify

that payments are to be applied to specific advances, nor do the payments themselves contain any

such designation.  In this case, the security for the line of credit was the same throughout.

Although the line of credit was renewed several times before and after May 5, 2003, the

definition of security in the line of credit and the security agreement did not change.  Neither

Rich, nor Rocky Mountain, nor the line of credit itself, made any designation of how the

payments were to be applied.  Accordingly, the court must apply the general presumption and

Rocky Mountain's payments are deemed to be applied against the oldest incurred advance on a

first-in-first-out basis.  *Kirkpatrick*, 22 U.S. at 737-38.

The question, then, becomes what was the balance owed by Rocky Mountain on the line

of credit on May 5, 2003.  Plaintiff provided a summary chart of all activity on this line of credit

from its inception until the present date. From this chart, the amount due on May 5, 2003, the

46th day from the filing of the tax lien, is $2,875,181.42.  This amount includes debt that was

incurred on several other lines of credit that were entered into with other entities controlled by

Dee and Lee Bangerter and Rich Financial.  Rich Financial agreed to consolidate these other

obligations with Rocky Mountain's line of credit.   In addition, money that was given or loaned to

Lee and Dee Bangerter's mother was consolidated in Rocky Mountain's line of credit.  But Rich

Financial has agreed that the amount due and owing should be reduced by the $49,086.05 paid to

the Bangerters' mother.  Therefore, Rich Financial asserts that the consolidated amount due and

owing to it on May 5, 2003, was $2,806,267.47.

The government, however, contends that Rocky Mountain was not obligated in any way

on these other notes, and, in such a situation, any priority accorded to the line of credit between

Rich Financial and Rocky Mountain would not apply to these other obligations.  Rich Financial

claims that it has an oral guaranty to pay the amounts consolidated into its line of credit with

Rich Financial.  The government claims that the correct amount due and owing Rich Financial

was $305,959.40, which includes the amount directly received by Rocky Mountain on its line of

credit minus $118,000 that the government alleges was paid to the Bangerter's mother.

Rich Financial asserts that the government is not in a position to argue that the amount

owed to Rich Financial as of May 5, 2003, should be reduced by the amounts of the notes

executed by United Alternative, Nurse Network, ProMed, and the other related third-party

entities that it combined with the Rocky Mountain note-receivable account. because Rocky

Mountain owed Rich Financial the amounts set forth in the documents produced by Rich

Financial.  Rich Financial and Rocky Mountain claim that they entered into an oral guaranty

agreement whereby Rocky Mountain agreed to be a guaranty on these other lines of credit and

agreed to consolidate the defaulted lines of credit into its own line of credit with Rich Financial.

The government has not cited to any authority that two parties to a guaranty agreement

cannot orally agree to such an obligation.  Under Utah law, a party to an oral agreement to

guarantee an obligation may assert the statute of frauds as a defense to the enforcement of the

agreement.  See Utah Code Ann. § 25-5-4(b).  However, a third party cannot raise the statute of

frauds defense to an oral guaranty agreement. *See Garland v. Fleischmann*, 831 P.2d 107, 109

(Utah 1992).

Representatives of both Rich and Rocky Mountain consistently testified that Rocky

Mountain had, in fact, guaranteed the payment of the obligations.  Also, there is no evidence that

Rocky Mountain itself has ever disputed the amounts due to Rich Financial, including amounts

owed to Rich Financial pursuant to Rocky Mountain's guaranty of other debtors' obligations.  The

government's argument that the obligations were combined simply to make the payment

obligations more convenient ignores that Rocky Mountain guaranteed the payment of the related

entities' obligations to Rich Financial.  The court finds no basis in the law or the factual

circumstances in this case that would invalidate the alleged oral guaranty.

Given that these consolidated amounts are guaranteed by Rocky Mountain, the court must

then determine whether these obligations were secured obligations under Rich Financial and

Rocky Mountain's security agreement.  By its terms, the security agreement provides that Rocky

Mountain's payment obligations to Rich Financial include amounts of any notes executed

pursuant to the security agreement "and any other obligations that now exist or may hereafter

accrue from [Rocky Mountain] to [Rich Financial]."

The government argues that Rich Financial provides no authority for its proposition that

oral guaranties can bring the obligations of other entities within the security agreement between

Rich Financial and Rocky Mountain and that oral guaranties can defeat a properly filed NFTL.

In order to defeat the general rule that the tax lien prevails, Rich Financial must show that it falls

within an exception to the general rule as set out in 26 U.S.C. § 6323.   There is no dispute,

however, that Rich Financial has a perfected security agreement.  Therefore, the issue is whether

the terms of the security agreement cover those obligations.  The language of the security

agreement states "any other obligations."   Rocky Mountain's guaranty of the other lines of credit

constitute other obligations.  There is no dispute between the parties to the agreement, Rich

Financial and Rocky Mountain, that the guaranteed obligations reflect proper contractual

obligations of Rocky Mountain to Rich Financial under the secured line of credit.  Therefore,

Rich Financial's security interest covering Rocky Mountain's obligations was properly perfected

before the recording of the first NFTL in the amount of $2,806,267.47.

It is undisputed that between May 5, 2003, and December 8, 2006, Rocky Mountain made $1,510,000 in payments to Rich Financial on the line of credit.  It is clear that subsequent payments can extinguish this obligation.  *See United States v. Kirkpatrick*, 22 U.S. 720, 737-38 (1824).  Rocky Mountain's subsequent payments, however, are not enough to extinguish the total amount Rocky Mountain owed Rich Financial on May 5, 2003.

Next, the court must determine whether Rich Financial's security interest in Rocky Mountain's accounts receivable included Rocky Mountain's settlement proceeds from its litigation against the State and whether its interest in such proceeds were choate before the government filed its NFTL.  Rocky Mountain reached its settlement with the state several years after the government filed its first NFTL.

If a security interest is to prevail over a subsequently filed federal tax lien, the interest must "exist" within the meaning of 26 U.S.C. § 6323(h)(1). To determine whether a security interest exists and has priority over a competing tax lien under the federal rule, courts look at two factors:  (1) chronological priority and (2) compliance with the doctrine of choateness.  *United States v. 110-118 Riverside Tenants Corp.*, 886 F.2d 514, 518 (2d Cir. 1989).  Therefore, not only does the security interest need to be first in time, it must also be choate to defeat the federal tax lien.

"A lien is choate where (1) the identity of the lienor, (2) the property subject to the lien, and (3) the amount of the lien are established." *National Communications Ass'n v. National Telecommunications Ass'n*, 1995 U.S. Dist. LEXIS 5333, *42 (S.D.N.Y. April 21, 1995). "Where the three-part test for choateness is satisfied at the time the IRS files its notice of tax lien,

or within 45 days thereafter, the state-created security interest takes priority over the competing tax lien." *Id.* at *43.

The dispute in this case is whether Rich Financial's security interest in Rocky Mountain's settlement proceeds were in existence before the federal tax lien arose. The government argues that the settlement proceeds did not come into existence until Rocky Mountain reached its settlement with the State. Rich Financial, however, argues that the settlement proceeds consist of accounts receivable that the State owed it for services rendered prior to the government's federal tax lien.

Both parties agree that Medicaid reimbursements can constitute accounts receivable. Both parties also agree that a lien on accounts receivable becomes choate, and the receivables exist, when the services giving rise to the accounts receivable are performed and payment becomes due. However, the parties dispute whether the settlement funds can be characterized as accounts receivable and whether they were choate prior to the filing of the federal tax lien.

Rocky Mountain's claims against the state was for breach of contract and breach of the covenant of good faith and fair dealing. The suit challenged the State's formula for payments on Medicaid reimbursements under Medicaid policies. Rocky Mountain sought $16 million from the State. The parties ultimately reached a settlement in which neither party admitted fault or liability and the State agreed to pay Rocky Mountain and the other named plaintiffs $7 million.

In *National Communications*, the court addressed a dispute over settlement funds between a party with a security interest in accounts receivable and the government, who had filed a federal tax lien. *Id.* at *61. Similar to Rich Financial, the secured party claimed that the settlement fund was simply proceeds of the preexisting accounts receivable because his security

interest was in the underlying collateral itself and his lien became choate when the debtor

performed services giving rise to the debt. *Id.* The court stated that the secured party's security

interest in the accounts receivable would have had priority over the federal tax lien "had there

been no dispute over the payment of those accounts, and no subsequent litigation resulting in the

compromise of multiple claims between the parties." *Id.* at *65. The court found that the

settlement was not directly linked enough to the underlying collateral--accounts receivable. *Id.* at

*67. The proceeds of the settlement fund were not specifically earmarked as settlement of the

claims for accounts receivable, but rather a compromised amount for multiple claims and

included monies owed under the contract and claims for damages. *Id.* Accordingly, the court

found that the settlement fund represented a new asset that did not exist for priority purposes at

the time the federal tax lien was filed. *Id.* The court concluded that because the settlement

occurred after all the liens had arisen, the security interest lien and the federal tax lien attached to

the settlement proceeds and became choate simultaneously. *Id.* at *67-68.

Rich Financial claims that this case is distinguishable from *National Communications*

because Rocky Mountain's settlement proceeds consist only of payment on accounts receivables.

Rich Financial relies on *Mecco Inc. v. Capital Hardware Supply, Inc.*, 486 F. Supp. 2d 537 (D.

Md. 2007), in which the court concluded after a bench trial that the case was distinguishable

from *National Communications* because the settlement agreement in *Mecco* referred specifically

to the settlement of a claim for unpaid labor and materials and sufficiently earmarked an amount

for the resolution of the claim for unpaid accounts receivable. *Id.* at 548.

The court finds this case more similar to *National Communications* than to *Mecco*. The

settlement between Rocky Mountain and the State did not specifically earmark the monies as past

due reimbursements. In fact, the State did not admit to any liability and the parties agreed to exchange mutual releases for the subject matter of the litigation. The settlement agreement in this case represents a compromise reached by the parties that is not specifically earmarked as a payment of outstanding accounts receivable. The court cannot conclude that Rich Financial's security interest was choate prior to the government's filing of the NFTLs. Because both the security interest and the NFTLS were in existence at the time that Rocky Mountain and the State entered into the settlement agreement, both the security interest and the NFTLS became choate simultaneously. Accordingly, the NFTLs have priority over Rich Financial's security interest.

Based on the court's conclusion that the security interest was not choate at the time the government filed the NFTLs, the court need not address whether the settlement proceeds were in fact accounts receivable or general intangibles. The court, however, notes that this court has previously found that a claim to a tax refund was a general intangible rather than account receivable. *See In re Certified Packaging, Inc.*, 1970 U.S. Dist. LEXIS 13030 (D. Utah 1970). A cause of action is generally considered to be a general intangible. Utah Code Ann. § 70A-9a-102(42)(a).

In this case, Rich Financial had a security interest in Rocky Mountain's accounts receivable but, unlike the secured parties in *National Communications* and *Mecco*, it did not have a security interest in general intangibles. The court notes, however, that the security agreement provided Rich Financial with the right to bring an action on Rocky Mountain's behalf for collection of accounts receivable. Rich Financial, however, chose not to be a plaintiff in the action against the State. In addition, Rich Financial amended its security interest to include the proceeds of Rocky Mountain's settlement with the State after it instituted this action. Such an

amendment suggests that Rich Financial did not believe it had a security interest in the settlement proceeds under its original security agreement that was in place at the time that the government filed the NFTLs.

The court concludes that the government's NFTLs have priority over Rich Financial's security interest in the settlement proceeds.  Accordingly, the court grants the government's Motion for Summary Judgment and denies Rich Financial's motion for summary judgment.

## CONCLUSION

For the reasons stated above, the government's Motion for Summary Judgment is GRANTED, and Rich Financial's Motion for Summary Judgment is DENIED.  The Clerk of Court is directed to close this case, each party to bear its own fees and costs.

DATED this 12th day of January, 2009.

BY THE COURT:

Dale A. Kimball,
United States District Judge